Filed 1/7/26  In re Ollie M. CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re OLLIE M., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AMANDA D.,<br><br>    Defendant and Appellant. | A172177<br><br>(Napa County<br>Super. Ct. No. 23JD000054) |

**THE COURT\*:**

It is ordered that the opinion filed herein on December 18, 2025, be modified in the following particulars:

On page 29, lines10-12, the following sentence is deleted:  "She attests that she consulted with mother's appointed appellate counsel (at FDAP) before making a conscious decision not to file a notice of appeal."

The deleted sentence on page 29, lines 10-12 is replaced with the following sentence:  "She attests that she consulted with mother's appellate

---

\* Tucher, P. J., Fujisaki, J., and Petrou, J. participated in the decision.

1

counsel (who was appointed at the request of FDAP) before making a conscious decision not to file a notice of appeal."

This modification does not effect a change in the judgment.


Dated:1/7/2026_____          Tucher, P. J._____
                                                PRESIDING JUSTICE



*In re Ollie M.* (A172177)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re OLLIE M., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>AMANDA D.,<br><br>     Defendant and Appellant. | A172177<br><br>(Napa County<br>Super. Ct. No. 23JD000054) |

Amanda D. (mother) seeks to appeal from a six-month status review order in a dependency case pertaining to her young son, Ollie.  (Welf. & Inst. Code, §§ 300, 361; statutory references are to this code.)  As a preliminary matter, she contends that her late notice of appeal must be deemed timely because her trial counsel's failure to file the notice on her behalf constituted ineffective assistance of counsel.  (See *In re A.R.* (2021) 11 Cal.5th 234 (*A.R.*).)  On the merits, mother challenges the sufficiency of the evidence to support findings that she was afforded reasonable reunification services, and that Ollie cannot be safely returned to her custody.  We find that mother may pursue her appeal.  However, we reject her claims of error and affirm the challenged order.

1

## BACKGROUND

***Proceedings Prior to Declaration of Dependency***

Mother filed a prior unsuccessful appeal from the dispositional order declaring Ollie a dependent of the juvenile court and removing him from the custody of his parents. (*In re Ollie M.* (Dec. 11, 2024, A169982) [nonpub. opn.] (*Ollie I*).) *Ollie I* contains a detailed account of the facts and proceedings that culminated in the disposition order, which we summarize here.

In October 2023, Napa County Health and Human Services (the department) filed a petition on behalf of six-month-old Ollie, alleging that he faced a substantial risk of physical harm due to intimate partner violence between mother and Ollie's father, Erik M. (father). (§ 300, subdivision (b)(1) (section 300(b)(1))). Department reports described incidents when both parents engaged in physical violence against each other and against the maternal grandparents. (Subsequent references to grandparents are to Ollie's maternal grandparents.) The most recent incident occurred in August 2023. Fortunately, mother had called grandfather to pick up Ollie before she was injured during the altercation with father. According to the police report, father was suspected of running mother over with his truck and had fled the scene. Mother was taken to the hospital with a possible brain injury, where she tested positive for methamphetamines. When police located father, he refused to submit to a sobriety test, admitted that he used cocaine the previous night, and was placed under arrest.

In the wake of the August 2023 incident, mother acknowledged memory problems due to brain trauma, but she insisted that the altercation was " 'all her fault.' " She denied using illegal drugs, and expressed deep frustration about a criminal protective order that had been obtained against father on

2

her behalf, reporting that he was a good father and caregiver. After father was released from jail, he rebuffed the department's attempts to contact him, and that attitude never changed.[1]

Before the department initiated this dependency proceeding, mother was offered family maintenance services, but she would not accept them. Mother insisted that the restraining order should be dropped, that father had done nothing wrong, and that she was at fault for violence in their relationship. She reported that she was receiving treatment for postpartum depression at Kaiser, but she declined to sign a release so the department could obtain information about her treatment. Mother admitted that she and father had used cocaine a few days before the August 2023 incident but described it as a one-time thing, and she insisted that drugs played no role in the altercation.

On October 24, 2023, the department took Ollie into protective custody with the assistance of law enforcement after learning that father had been seen in mother's home notwithstanding the restraining order. Mother became distraught. She denied violating the restraining order, taking the position that it did not prevent father from being in her home so long as they were not together. After Ollie was taken into custody, officers placed mother on a 72-hour psychiatric hold because she had threatened to kill herself.

In November 2023, Ollie was placed with his grandparents. Mother continued to resist department efforts to provide services. She was angry about Ollie's removal, believing it was unjustified and illegal, she denied domestic violence ever occurred, claimed she was at fault for her own injuries in August 2023, disputed the results of her hospital drug test, and denied

---

[1] As father is not a party to this appeal, we discuss his situation only as it is relevant to mother's appeal.

3

that she previously admitted using cocaine. In late November, mother accepted a referral for therapy, and she was referred for alcohol and drug services, but she would not accept services relating to domestic violence and refused to authorize release of any records.

In a December 2023 disposition report, the department recommended that the juvenile court declare Ollie a dependent, continue the relative placement, and order reunification services for both parents. The report contained additional background about prior violent incidents and the ongoing investigation of the August 2023 incident. Mother objected to the department's recommendations and the matter was continued for a contest. Prior to the contested hearing, mother's therapist reported that mother was anxious and paranoid, that she was protecting father, and she may not have been taking prescribed medication. Mother refused to see the therapist again and " 'recanted' " all of her releases, but she eventually accepted a referral to another therapist.

At the contested hearing, mother did not dispute jurisdiction but requested that the court return Ollie to her with a family maintenance plan. On January 18, 2024, the court exercised jurisdiction over Ollie, and declared him a court dependent (the January 2024 order). The court found that Ollie faced a substantial risk of danger due to concerns about " 'the history of violence in the home, the escalation of violence, the parents' drug use, mother's mental health, the home environment, and the lack of engagement with the department.' " The court sustained allegations in the petition regarding intimate partner violence and the August 2023 incident, but it found the department failed to prove the parents knowingly violated the restraining order. The court approved family reunification plans for both

4

parents and ordered the department to provide mother with supervised weekly visitation with discretion to move to unsupervised visits.

### *Proceedings Included In Six-Month Status Review*

Mother appealed the disposition order, which was affirmed by this court in *Ollie I*, as we have noted.[2]  While the *Ollie I* appeal was pending, the juvenile court conducted a contested six-month status review in September 2024, which culminated in the order mother seeks to appeal here.

#### *April 2024 Interim Review*

On April 4, the court held a special interim review.  Father had pled not guilty to felony hit and run and misdemeanor domestic violence, and he persisted in his refusal to engage with the department.  Mother was unemployed and struggling to pay rent.  The department reported that she only superficially engaged in services and did not understand the need to demonstrate Ollie could be safe in her care.  Mother maintained that Ollie should be returned to her, believing she had done everything the department asked of her.

Mother was in therapy, but missed several sessions when her therapist was away for more than a month.  She initially refused to participate in random drug tests, claiming an invasion of her privacy, but eventually she

---

[2] In *Ollie I*, we found among other things, that the evidence established that the parents' volatile relationship created a substantial risk to Ollie's safety and well-being: "The department's evidence shows that parents engaged in violent altercations prior to the August 31 incident, at which point the danger attendant to their behavior escalated to a potentially lethal level. Ollie was present when the parents began fighting on August 31, and the fact that the grandfather was able to retrieve the infant before mother was seriously injured that day does not diminish the evidence" that these parents had put their child at substantial risk of harm.  We also found mother's "persistent denial of problems that led to this dependency further impaired her ability to protect Ollie adequately."

produced a negative test.  She also completed a psychological evaluation, which resulted in recommendations for her to reduce stressors in her life, to continue drug testing, and to participate in psychotherapy.  Mother continued refusing domestic violence services.  But she engaged in supervised visits and her interactions with Ollie were largely positive, although one visit ended early because mother was unable to regulate her emotions.  In March, visits progressed from supervised at the department to monitored in the community, but at a March 21 visit, mother "became triggered" when it was time for Ollie to leave, cried, used foul language, and said she was " 'done with everything.' "  After that incident, visits were held at the department and mostly went well.

Mother appeared at the interim review hearing with counsel and submitted on the department's report.  Then she personally addressed the court, asking why Ollie was not being returned to her, as she felt she had completed her case plan.  The court explained that the purpose of the interim review was to make sure mother was on track, and it shared that mother had made some progress, but there were ongoing issues and concerns.  Mother disagreed with the court, refused to end the encounter, and repeatedly stated, "What about my son?" until the hearing was adjourned.

### July 2 Hearing

The six-month review was called for hearing in early July but was continued until August to give the department more time to complete the status report.  Mother's counsel did not appear at the July hearing due to a medical issue, but mother objected to the continuance in a disruptive fashion.

### August 2024 Status Report

The department recommended terminating reunification services for father and ordering that services for mother continue.  It had emphasized to

6

mother that she needed to demonstrate her understanding of the impact of domestic violence by displaying behavioral changes, but mother adamantly denied any domestic violence had occurred. Since the interim review, she had secured employment, participated in therapy and random drug testing, and was committed to yoga therapy, but she was slow to engage in services.

The department was concerned about mother's minimal progress on her case plan objective to identify and sustain a support network of safe individuals who were willing and able to intervene to keep Ollie safe and reduce the risk of harm by father. Mother included grandparents in her support network, but her attitude toward them was inconsistent. She said that if there was a future altercation between father and grandfather, she would take Ollie to the home of her neighbor, Karen. When Karen attended a team meeting, she shared her belief that the "whole situation is a great tragedy" because mother, father, and Ollie were a great family and should be together. Mother's friend Colleen was identified as an important support person and attended a team meeting in June, but Colleen did not speak during the meeting due to mother's odd behaviors, which included "going on tangents, stating she lives life on the edge" by, for example, riding her skateboard at high speeds downhill and through traffic. During the meeting, mother reverted to blaming the department, and could not be redirected.

Mother also made minimal progress as to the plan objective to use her support team to implement a domestic violence response plan. A primary impediment was mother's ongoing denial that any domestic violence occurred. She also maintained that she understood her triggers, and how to deal with them. On April 30, mother finally began to address the requirement, submitting "an interactive safety plan document." Her plan identified the nearest police department and stated she would use her bicycle

so she would not be noticed while contacting her support group. The plan also included the following statement: " 'My fiancé has never threatened me always encouraged me to do as I pleased and spend time with my friends.' " Mother could not be persuaded to remove this statement from her plan.

Mother made moderate progress on her case plan objective to develop and demonstrate coping strategies to manage stressors in her relationships with others as well as her other mental health symptoms. The department documented instances when mother's difficulty managing her emotions impacted her functioning. For example, during a visit with Ollie in February, mother yelled at the social worker and was unable to regain her composure, so she called her father to be her support person, but when he arrived mother yelled and cursed at him and accused him of being a drunk. Mother persisted in this conduct to the point that Ollie and grandfather were escorted out of the room. In March, mother escalated during a check-in phone call with the social worker, cursing at her and describing the doctor who conducted the psychological evaluation as an incompetent old man before hanging up. Mother refused housing assistance as unneeded, made inconsistent reports about her financial resources, and considered such inquiries unjustified. When the social worker offered a referral to a neuropsychologist, mother became angry, the meeting had to be terminated, and she was still yelling at the social worker as the worker drove away from mother's home.

Mother was inconsistent or resistant about providing verification of her activities. She started an online anger management course through Kaiser, but apparently did not complete it, and continued to refuse to release her Kaiser records. She participated in a parenting class, but only after repeated requests that she provide verification forms, did the department obtain them from grandmother. Mother initially declined to participate in a co-

8

dependency program, stating she was not in a co-dependent relationship, but after she was reminded of the need to engage in services, mother completed the online program.

Mother had been attending therapy since January. She missed five sessions because she was unwilling to meet with the therapist's intern and, because she had begun working, had been unable to fit a session into her schedule since June 24. Scheduling aside, the therapist reported that mother was "moving forward and improving," joint sessions with grandmother helped her focus, but she continued to struggle around issues relating to the department's involvement as well as anything having to do with the domestic violence.

Another plan objective required mother to refrain from illegal substance abuse and to develop a relapse prevention plan. For most of the period, mother insisted she did not need the plan because she did not use illegal substances. In late April, she provided "photos" of a prevention plan, but she described it as including programs she did not need, and she identified herself as her support system. Mother's case plan also required random drug testing. After her initial refusal to participate for privacy reasons, she began participating in random drug testing on March 13 and returned negative results thereafter. Therefore, the drug testing requirement was moved to the department, with the social worker to have discretion to conduct random drug tests.

Mother was engaged in her visitation plan, and the department had transitioned her visits to a location outside the department. In June, mother progressed to having monitored five-hour visits in her home or an identified community setting. Absent a few exceptions, mother's visits were positive. She was always prepared with appropriate snacks and child-appropriate

activities. And she "consistently demonstrate[d] a desire and commitment to maintain visitation with her child."

The department's assessment was that Ollie could not be safely returned home. Because of mother's refusal to acknowledge prior domestic violence, she was not able to protect Ollie from risks of harm associated with such conduct, the department opined. But it was encouraged by mother's engagement in therapy and progress in other areas, including visitation. Accordingly, the department believed there was a substantial probability Ollie could be returned to mother at the 12-month review.

### *August 13 Hearing*

At the first session of the status review, mother requested a contest on the ground that the case "was ready to move into family maintenance." While the court and counsel attempted to schedule the contest, mother interjected that she wanted to represent herself because she was being prevented from presenting the court with her "entire case plan and records of every achievement [she had] done," and she did not understand why Ollie could not be returned home. The court interpreted mother's remarks as a motion to represent herself or have new counsel appointed. The motions were addressed in a confidential hearing and denied. To minimize delay, the contest was set to begin in two days.

### *August 15 Hearing*

At the contested hearing, the court received the status report and a CASA report, which concurred in the department's recommendations. Then the court invited opening arguments regarding mother's request for a family maintenance plan.

Describing the case as difficult and unusual, mother's counsel argued that she intended to show that mother had made a reasonable request for

10

Ollie to have overnight visits supervised by grandmother; the department would not agree to the request; and the refusal was unjustified. Counsel also argued that mother had complied with all case plan requirements; the only reason mother became emotionally deregulated was because the department refused to return her son; and the department was refusing to return Ollie because mother was unwilling to admit that she was run over, even though she believed that had not happened.

County counsel argued that the department was recommending an additional period of services because mother had made progress, but she had not yet complied with her case plan or demonstrated Ollie could be safely returned. The court inquired about mother's specific request for overnight visits supervised by grandmother. The social worker responded that some progress had been made in that direction, but when the department talked with grandmother, she was not aware of the safety plan. The social worker explained that a Child and Family Team (CFT) meeting was required, so the department could be sure everyone in mother's support network was aware of how to keep Ollie and mother safe. County counsel added that the safety plan was not the only unresolved issue.

But the court continued to focus specifically on overnight visits, asking when they could safely occur. County counsel urged caution. However, minor's counsel expressed concern that such a young child had been in a temporary placement for a year. She opined that overnight visits supervised by grandmother was a great idea and that a safety plan could be worked out very quickly, but added that she would be "totally opposed" if mother was seeing father at all. After a brief off-the-record discussion, the court and counsel left the courtroom to discuss the matter in chambers.

When the hearing reconvened, the court announced that the parties had talked in chambers about a possible settlement and asked them to state their positions. County counsel was under the impression the court intended to order supervised overnight visits despite the department's objection, but the court clarified that it was only attempting to facilitate a settlement. The department then agreed to submit on the specific request for overnight visits supervised by grandmother under the condition that no such visit occur until after completion of a CFT meeting. A CFT had already been scheduled for August 16, and mother acknowledged that any overnight visit was conditioned on her support network attending that meeting. The court opined that a good outcome was reached because it afforded time to address the "safety issue."

The court spoke directly to mother about the importance of the CFT meeting, emphasizing that "if there are any safety concerns we are going to pull back." Then the court made the following ruling: "So I will be granting the request from [mother's counsel] in terms of her proposal, overnight visitation supervised by the Maternal Grandmother. [¶] These are overnights, subject to the CFT members attending the meeting tomorrow, and making sure that we are all on the same page regarding the safety concerns." The court directed that any written order memorializing the agreement was to include a provision that there be no contact with father, and after an off-the-record discussion, the court asked County Counsel to prepare the order.

In light of the parties' agreement, the court continued the status review until September 17, 2024. It found Ollie's current placement remained necessary and appropriate, that the department made reasonable efforts to return the child to a safe home, and that mother had made moderate

12

progress toward alleviating the causes necessitating the placement while father had made no progress at all.

### *August 27 Hearing*

On August 27, the court held a hearing at the department's request to clarify its August 15 order and reset the matter for a contest. County counsel reported that the department had not submitted a formal order after the prior hearing because there was confusion about what the court ordered. Mother's counsel explained: she and mother believed that the court ordered overnight visits to occur every night, whereas the department believed that it retained discretion to regulate the number of overnight visits mother would have. County counsel added that the point of confusion might be moot in light of additional information, which the court then asked to hear.

County counsel explained that the department would be filing an addendum report and, in the meantime, offered to prove the following: The CFT meeting was held on August 16, but mother was not prepared, so another meeting was held on August 19. Mother and her support group attended, and everyone except for mother agreed that if father showed up during an overnight visit, the police were to be called. Mother was heard saying she would not put that in the safety plan and something about calling the fire department but not the police. Nevertheless, after the CFT meeting was completed on August 19, mother had an overnight supervised visit that night. Two days later, there was a regular monitored visit scheduled to take place at mother's home. But when the visitation supervisor arrived, mother would not allow her into the house, and her behavior became so unreasonable the visit had to be canceled. And at some point during the interaction, the worker witnessed mother use her home security system to speak to a male inside the home. In light of these events, the department intended to use the

13

discretion it believed that it still had to return to visitation supervised by the department.

Mother argued that the department's offer of proof was irrelevant, as it was nothing "different from what we had heard before," and there was no evidence nor even an allegation that Ollie needed to be kept safe from father. Mother took the view that the only issue for the court to resolve was whether overnight visits were to occur every night so long as grandmother was present to supervise.

County counsel pointed out that if the court had meant to order overnight visitation every night, that would be family maintenance, and the department would never have agreed to a family maintenance order, to which the court responded, "I understand that." The court stated that the one thing that was "clear" about the August 15 agreement was that it was "subject to Mother not having contact with Father." Regarding the department's discretion, the court had assumed that the parties would get that settled using "standard language."

Minor's counsel remained concerned about the amount of time Ollie had been in an out-of-home placement, but she was more concerned about contact between mother and father because she did not want to put Ollie's safety at risk.

Ultimately, the court set aside the August 15 agreement, reinstated prior orders that were in effect on that date, and scheduled a contested review. Mother's counsel asked the court to clarify that it was not reinstating the prior visitation order, which required only a minimum of three hours of supervised visits a week, as mother had progressed by August 15 to six visits per week. The court responded that it was in fact reinstating the prior visitation order, pending completion of the contested review.

14

*September 2024 Addendum*

The department's addendum report discussed the dispute regarding mother's visitation. On August 2, the day after the department completed its status review report, the department had held a "Step Up" meeting with mother and grandmother to discuss visitation. At that juncture, mother was receiving monitored visits by department coaches for two hours a day, four days a week and for five hours on Sundays, as well as five-hour visits on Saturdays monitored by grandmother. During the Step Up meeting, mother expressed concerns about the department's involvement and about missing milestones with Ollie. When the social worker attempted to explain safety concerns regarding domestic violence, mother became angry. The social worker conveyed that a safety plan needed to be implemented before visits could progress and encouraged mother to bring her support team to a CFT meeting on August 16. Insisting that no domestic violence occurred, mother flailed her arms, accused the department of mistreatment and refused to " 'bow to all of you guys.' " She became increasingly agitated, and grandmother could not redirect her, explaining to the social worker that once mother " 'hears DV, its hard to get her attention.' "

The September 2024 addendum also discussed details of the CFT meetings held on August 16 and August 19, both over "Zoom" at mother's request. She was accompanied at the meetings by her support team, which included her parents, neighbor, and two friends. Mother's therapist and the CASA advocate also attended at least one of the meetings.

At the August 16 meeting, the support team stated they had no safety concerns for mother, but the social worker responded that mother needed an updated safety plan addressing the roles of her support people. The department also requested that father's name be removed as a designated

support person, at which point, grandfather shared that if father was ever in the home, it was only to shower and change clothes. When asked to clarify this statement, grandfather withdrew it. The social worker suggested rescheduling an upcoming visit after the next CFT meeting so that it could potentially become an overnight. Mother became upset at the suggestion, and was adamant that overnights had already been ordered and were to begin that weekend no matter what. During the second half of the 30 minute meeting, mother was unable to be calm or engage, pacing, talking over people, and refusing to be quiet.

At the August 19 CFT meeting, a department supervisor reviewed mother's updated safety plan and asked questions of her support team. Mother walked away from the screen when she disagreed with parts of the plan, such as what the group would do if father showed up. Again, mother became agitated, talked over others, and could not be redirected. She yelled that members of her support group were not to call the police and accused the department of emotional abuse. Meanwhile, the supervisor continued reviewing the safety plan and ultimately approved it. The social worker attempted to explain "progressive visitation," but mother balked, insisting the court had already ordered overnights to occur every night.

On the evening of August 19, grandmother supervised mother's overnight visit and reported by email that it went well. When the social worker called to follow up, mother was with grandmother and talked over her during the conversation, stating, " 'I refuse to call the police . . . You cannot make me call them! You are putting me in a situation of abuse!' " On August 20, mother called and cancelled visitation with her Family Time supervisor, stating " 'The deal is off. ' " On August 21, mother had a fractious phone call with the social worker, stating twice she would have her overnight visit that

16

day and then hanging up. The social worker followed up with grandmother to confirm an overnight had not been approved for that night, and that the monitored visit scheduled for later that day would be supervised by the department.

When the department's Family Time coach arrived at mother's home to monitor the August 21 visit, mother would not allow the coach in the home, insisting she was going to have an overnight visit supervised by grandmother. The coach advised mother that if she was not permitted to monitor the visit it would be cancelled. Mother threatened to call the police, using profanity. Eventually, grandmother left with Ollie, despite mother's objections and threat to do something if grandmother took Ollie with her. Before leaving, the coach also overheard part of a conversation mother had with a male inside the house, which was transmitted over the home security system speakers. Mother was crying and using profanity and a man's voice was talking over her.

On August 22, when the social worker reached mother by phone, mother reported that she was cancelling visits going forward and did not "want 'CPS involvement.' " On August 23, mother told the social worker she would have a weekend visit supervised by grandmother, as she did not want the department in her home. The social worker advised mother that future visits would take place at the department due to mother's inability to regulate her emotions the previous week. Mother said she would not go to the department and ended the call. She was not responsive to subsequent efforts to contact her until August 29, when she participated in a monthly contact call. Mother declined to meet with the social worker before the review hearing, and when offered information about domestic violence services, she ended the call.

17

The addendum also included an update regarding mother's therapy. She missed three sessions between May and June, had only one session in July due to her work schedule, and attended two sessions in August. Mother's behavior during therapy was "volatile," and the therapist was attempting to help her with emotional regulation. Efforts to address domestic violence were being made, but mother was afraid that anything she said would be used against her in court. She denied needing a safety plan, maintained she would just walk away, and portrayed herself as the aggressor in her relationship with father. The therapist recommended mother be referred for domestic violence and anger management courses. The department had been advised that the therapist could not see mother after August 16 due to contract changes, but mother would not agree to another therapist and the department arranged for her to continue with the current therapist until October.

### *Contested Review Hearings*

On September 10, 2024, mother appeared by Zoom and her counsel was granted a two-day continuance so they could confer in person. Then mother made another *Marsden* motion, which was denied following a confidential hearing. Mother's counsel requested a guardian ad litem for mother, which was also denied. On September 12, the start of the contested review was further delayed because mother attempted to appear by Zoom, but her personal appearance was required. Following brief opening statements, the department elicited testimony from the social worker, Ms. Ramirez, and mother testified on her own behalf.

Ramirez testified that since she was assigned to Ollie's case in May 2024, she had met with mother at least once a month to review the case plan, made referrals for services to support mother, and arranged for regular CFT

18

meetings to occur, including meetings to discuss overnight visits. Ramirez's last contact with mother was a September 3 phone call when mother refused to meet with Ramirez and stated that "she did not want to move forward." Ramirez testified about encounters documented in the reports, including the incident when mother was notified that visitation would be held at the department due to the August 21 incident, and she accused the department of "purposeful abuse," and expressed that she did not want any more visits.

Under cross-examination, Ramirez testified that it was always difficult to talk with mother about her case plan. Questioned about what parts of the plan were not completed, Ramirez testified that mother did not have a safety plan that mitigated concern about Ollie being exposed to domestic violence, and that she was inconsistent about attending therapy and about addressing domestic violence during therapy. Mother's inability to emotionally regulate in front of Ollie was also a "big concern." Under redirect, Ramirez elaborated on unresolved safety issues, testifying there were no "action steps" in place to ensure Ollie's physical safety if domestic violence were to occur. Ramirez testified about mother's refusal or inability to acknowledge domestic violence, recalling that when the subject was raised, mother became so "elevated," it was difficult to continue the conversation.

Mother testified that Ollie should be returned home because she had "put a fair amount of effort in completing the case plan." From mother's perspective, she had started work on the case plan the previous November (prior to disposition), and at that time the department required her to accept services through NEWS. However, mother explained that NEWS had repeatedly denied services to her family in the past; once because they refused to acknowledge that father was a victim of domestic violence, and

19

another time when mother felt that she had been victimized by grandparents, but that was not considered "intimate."[3]

Mother testified that the reason she would not agree to call the police if father arrived in her presence was because the police had done "a lot" of harm to her. As an example, mother recalled an incident when the police had attempted to "bake" father by leaving him handcuffed in a car on the hottest day of the summer. Mother acknowledged the restraining order and testified that if father ever showed up at her house she "would have to tell him to leave," but she did not think "he would ever come." If he did not leave, mother would yell for her neighbor or call the fire department. Mother testified that if there was no restraining order, it was highly unlikely father would ever get loud or angry, but if that happened, she would keep Ollie safe by leaving the situation.

Under cross-examination, mother testified that when she and father lived together, he would get upset with her "but not necessarily angry." When they had disagreements, father would just leave; he was never violent, and never pushed her or yelled at her. The department's counsel attempted to ask about an incident when mother and father were moving a couch, but mother denied the incident occurred. Regarding the August 2023 incident, mother testified that in her opinion that was not a hit and run. After many nonresponsive answers, mother acknowledged that she was hit by a vehicle, but she testified father was not the person who was driving the vehicle that hit her. When asked who was driving, mother responded that she believed it was "still up in the air," because the identity of the driver had not been

---

[3] Ramirez testified that mother's case plan does not require her to accept services from NEWS. The department had been informed that mother independently tried to obtain services from that provider in the past and was not accepted because she reported she was not a victim.

proven in criminal court. Mother was asked repeatedly whether she felt she needed a safety plan, but failed to provide a responsive answer. Mother did testify that she disagreed with the department for seeing father "as a monster." When mother was questioned about the CFT meetings in August, the exchange devolved, necessitating a recess for the court to consult with counsel. After the break, mother was excused from the stand.

During closing argument, mother's counsel did not request that Ollie be returned home, but did contend she was denied reasonable services. Focusing on the misunderstanding surrounding the August 15 order, mother argued there was an adequate safety plan for overnight visits to continue. Beyond that, mother requested that if future visits were supervised by the department, the court order them to occur at a location other than the department because of mother's history of trauma.

County counsel urged the court to adopt the department's recommendations. Despite concerns about mother's ability to achieve behavior changes necessary for Ollie to be truly safe in her care during the limited time frame, the department remained willing to give mother that opportunity and hoped she could reunify because of her "strong bond and love for her child." The biggest safety threat pertained to mother's relationship with father. Counsel argued that danger issues can sometimes be rectified without acknowledging them, but mother had been unable to progress because she was unwilling to recognize the violence in her life. The department was also concerned by mother's inability to regulate herself in difficult situations, and argued that the evidence showed that problem was more far-reaching than mother claimed. Minor's counsel joined the department's argument.

### *Six-Month Review Orders*

After the status review hearing was adjourned, the court returned to the record and stated: "Due to the contentious nature of the hearing, the Court is issuing its ruling outside the presence of the parties." The court then adopted the department's recommendations. It found, among other things, that Ollie could not be safely returned to mother, incorporating evidence from the department reports and the CASA report. The court also noted it had considered a declaration filed by mother. The court found that reasonable services had been provided or offered to both parents, Ollie's placement was necessary and appropriate, and the department had complied with the case plan in its efforts to return the child to a safe home. Mother's progress toward alleviating the problems that led to the placement were minimal, and father had made no progress at all.

On September 12, 2024, the court issued an order after hearing (the September 2024 review order), which was largely consistent with its oral rulings but more expansive, and included a visitation order. The court ordered visits for mother at least three hours per week. The department had discretion to increase the length and frequency of visits and to move to unsupervised visits, including up to two overnight visits per week. The department could increase overnight visits to two weeks in duration, but any increase beyond two overnight visits required 48 hours' notice to all parties, who were entitled to be heard as to their objections. The department retained discretion to reduce visitation to the minimum ordered by the court even after increasing visitation.

### *Mother's Request For Relief From Default*

On November 25, 2024, mother attempted to personally file a notice of appeal from the September 2024 review order. For mother's appeal to be

timely, she needed to file a notice of appeal on or before November 12. (Cal. Rules of Court, rule 8.406(a)(1).) Thus, her notice was received but not filed by the superior court. On January 10, 2025, the First District Appellate Project (FDAP) filed a motion on behalf of mother, requesting that this court authorize the late filing of mother's notice of appeal. The motion was accompanied by declarations from mother and her trial counsel, Ms. Wilensky.

Mother attests that she asked Wilensky to file a notice of appeal on September 11, 2024; that she followed up "multiple times" to inquire why the notice had not been filed; and that Wilensky, who was out on medical leave, did not respond to her inquiries. In November, mother reached out to County Counsel and the department, requesting that a notice of appeal be filed. Then on November 11, mother spoke to Wilensky by phone and asked her to file a notice of appeal. However, Wilensky did not file the notice, mother avers. So on November 25, mother filed it herself.

Wilensky attests that while she was on medical leave from October 15 until November 15, 2024, mother sent her multiple emails requesting information and voicing complaints. In a November 4 email, mother requested for the first time that Wilensky file a notice of appeal from the September 2024 review order, and she renewed that request on November 11. On November 12, Wilensky consulted with mother's appellate counsel in her pending appeal, and, after that discussion, Wilensky determined that she "would not be filing the notice of appeal." Thereafter, Wilensky received multiple emails from mother requesting confirmation that a notice of appeal was filed.

Wilensky attached to her declaration, an email she received from County Counsel on November 12, 2024. The email advised Wilensky that

23

mother had twice attempted to remove Ollie from his placement; the first time she was intercepted by police, and the second time she was successful, but the child was recovered. County counsel also notified Wilensky that they received documents from mother, which they attempted to file in order to preserve mother's appellate rights, but the documents were declined with the explanation that the notice of appeal "should come from the attorney of record" on a different form, and without "typed signatures . . . when filing over the counter."

FDAP argued that mother was entitled to relief from her failure to file a timely notice of appeal because Wilensky's conduct constituted professional incompetence and the only way to remedy the error was to decide this appeal on the merits. (Citing *A.R.*, *supra*, 11 Cal.5th 234.) The department did not file a response to FDAP's motion. Concerned about delay, this court granted FDAP's motion without prejudice to decide the jurisdictional issue along with the merits of the appeal. We directed the parties to address this threshold question in their appellate briefs, and to focus on specific factual issues that distinguish the present case from *A.R.*

## DISCUSSION

### I. Parties' Contentions and Preliminary Issues

Both parties filed oversized appellate briefs that focus on issues other than this court's jurisdiction. Mother devotes most of her brief to arguing that the evidence does not support the September 2024 review order. She then briefly addresses the fact that she did not file a timely notice of appeal, taking the position that this court has jurisdiction to hear her appeal pursuant to the holding of *A.R.*, *supra*, 11 Cal.5th 234 because Wilensky's failure to comply with mother's request to file a notice of appeal constitutes professional incompetence as a matter of law. For its part, the department

24

avoids discussing these issues by declining to dispute jurisdiction or mother's contention she was denied effective assistance of counsel. Instead, the department argues that mother's appeal should be dismissed as moot because the September 2024 review order was superseded by a subsequent 12-month review order or, alternatively, that the September 2024 review order should be affirmed.

After the parties filed their briefs, the department expanded its mootness argument in a motion to dismiss this appeal on the ground that Ollie was returned to parental custody with family maintenance services at a 24-month review hearing.[4] Mother opposes the motion, arguing that her claims are not moot because the challenged findings could continue to adversely affect her. We agree.

The department fails to establish mootness by ignoring the fact that Ollie remains a court dependent. (See e.g. *Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404 [detriment finding at the 18-month review could continue to adversely affect parent should minor again be removed]; *In re A.O.* (2025) 111 Cal.App.5th 1048, 1061–1062 [erroneous reasonable services finding at 6-month review could affect parent's rights throughout proceeding].) As mother contends, a finding that reasonable reunification services have been provided can have serious current and future effects on a family in an ongoing dependency case. The reunification period starts running on the date of initial removal (§ 361.5, subd (a)), and this period does not reset if a supplemental petition is filed, and the child is redetained. (See e.g. *In re*

---

[4] We already granted the department's unopposed request to take judicial notice of the 24-month review order. Its request for judicial notice of the 12-month review order is denied, however, since relevancy is a precondition for judicial notice. (*People ex re. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2.)

*Michael S.* (1987) 188 Cal.App.3d 1448, 1459.)  Moreover, in cases in which a subsequent petition is filed, a new period of reunification is not automatic, and a key factor in deciding whether to order additional services pertains to whether prior services were adequate.  (*In re Barbara P.* (1994) 30 Cal.App.4th 926, 933–934.)  Accordingly, we deny the department's motion.

Although the department does not contest appellate jurisdiction, we have an independent obligation to confirm whether jurisdiction exists.  (*Kirk v. Ratner* (2022) 74 Cal.App.5th 1052, 1060–1061.)  Filing a timely notice of appeal is a jurisdictional deadline, and courts lack power to extend it.  (*A.R.*, *supra*, 11 Cal.5th at p. 246.)  However, the right of a parent in a dependency proceeding to seek relief for violation of her right to competent representation is not subject to the same filing deadline, and our Supreme Court has found that the failure to file a timely notice of appeal does not "categorically cut off any possibility of [an] appeal" if that failure is attributable to the incompetence of the parent's appointed counsel.  (*Id.* at p. 251)  In that situation, we have authority to deem the appeal timely filed and within our jurisdiction to review.  (*Id.* at pp. 256–258.)  For reasons set forth below, we take that course here.

## II. Ineffective Assistance of Counsel Regarding Notice of Appeal

### A. Requirements for Obtaining Relief under *A.R.*

In *A.R.*, a mother "promptly" directed her court-appointed counsel to appeal from an order terminating mother's parental rights, but the attorney "mistakenly" filed a late notice of appeal.  (*A.R.*, *supra*, 11 Cal.5th. at p. 243.)  Mother and her attorney both attested that mother "failed to file a timely notice of appeal solely because her attorney failed to competently discharge that responsibility."  (*Id.* at p. 246.)  Moreover, they both acted promptly to preserve mother's rights:  the notice of appeal was filed only four days late;

26

mother filed her request for relief from default along with a timely opening brief on the merits; and after mother's appeal was dismissed, she filed a petition for writ of habeas corpus, which was summarily denied. (*Id.* at p. 244.) Following a grant of review, the *A.R.* Court held that a parent may challenge her counsel's failure to file a timely notice of appeal from an order terminating her parental rights based on the attorney's failure to provide competent representation. (*Id.* at pp. 243, 246.) The parent may, within a reasonable timeframe, obtain relief from default by demonstrating in the court of appeal that the untimely filing of a notice of appeal constituted ineffective assistance of counsel. (*Id.* at pp. 247–248.) To establish a prima facie case for relief, the parent must satisfy three requirements.

First, the parent must show that her counsel "failed to act in a manner to be expected of reasonably competent attorneys" practicing in the field. (*A.R.*, *supra*, 11 Cal.5th at p. 251.) The *A.R.* Court observed that "generally," this requirement can be satisfied by showing that the parent directed counsel to file an appeal and counsel failed to do so in a timely manner. (*Id.* at p. 252.) But the Court made clear that it was not addressing "a situation in which the lawyer concludes that there are no arguable grounds for appeal." (*Id.* at p. 252, fn. 3.)

Second, the parent must show prejudice. (*A.R.*, *supra*, 11 Cal.5th at pp. 252–253.) Because the injury in this context is not denial of an appellate victory, but denial of the opportunity to appeal at all, once the parent shows that counsel incompetently failed to file a timely appeal, the parent may establish prejudice by demonstrating that she would have taken a timely appeal if not for counsel's deficient representation. (*Id.* at pp. 252–253.)

Third, the parent must establish "promptness and diligence in pursuing an appeal," as the "costs of delay are particularly acute" in dependency matters. (*A.R.*, *supra*, 11 Cal.5th at p. 253.)

## B. Analysis

As a preliminary matter, we note that *A.R.* involved an appeal from an order terminating parental rights, which is a "uniquely serious step" in a dependency case and "widely recognized as ranking 'among the most severe forms of state action.'" (*A.R.*, *supra*, 11 Cal.5th at p. 245.) By contrast, this case involves an interim status review order that includes a discretionary grant of additional reunification services to mother. Nevertheless, the statutory right to competent representation applies throughout the dependency proceeding. (§§ 317, 317.5.) Thus, the reasoning of *A.R.* is sufficiently broad that it appears to authorize the ineffective assistance challenge that mother brings here.[5]

Mother takes the position that trial counsel's failure to file a notice of appeal pursuant to the parent's instruction constitutes professional incompetence as a matter of law. However, *A.R.* affirms that the burden is on the parent to prove she was ineffectively represented (*A.R.*, *supra*, 11 Cal.5th at p. 251), and the *A.R.* Court's findings were based on the specific facts of that case. There, the parent asked her court-appointed counsel to file a notice of appeal five days after the court issued the order terminating parental rights, but the attorney "forgot about the request until it was too late" to file a timely appeal. (*Id.* at p. 244.) In seeking relief from default,

---

[5] We admit to a certain tentativeness in our conclusions regarding jurisdiction, given the paucity of the briefing on this issue, and we observe that the practical result of our finding jurisdiction and affirming the juvenile court's order is the same as if we were to have denied appellate jurisdiction because of appellant's failure to get a proper notice of appeal timely filed.

both the parent and the attorney attested that the attorney was incompetent for failing to file the notice of appeal before the deadline. (*Id.* at p. 246.) Under those facts, the Court observed that "generally" deficient performance can be shown when trial counsel was directed to file a notice of appeal but failed to do so in a timely manner. (*Id.* at p. 252.) But the Court expressly was not addressing cases in which counsel had found no arguably meritorious issues. (*Id.* at p. 252, fn. 3.)

The circumstances of this case are very different from *A.R.* Wilensky does not concede she was incompetent. She attests that she consulted with mother's appointed appellate counsel (at FDAP) before making a conscious decision not to file a notice of appeal. This evidence implicates the situation that the *A.R.* Court declined to address—when counsel concludes there are no arguable grounds for appeal. (*A.R.*, *supra*, 11 Cal.5th at p. 252, fn. 3.) However, Wilensky does not actually attest that she determined there were no arguably meritorious issues to appeal. More troubling, the declarations establish that Wilensky failed to communicate with mother about the matter at all. When we consider Wilensky's passive silence in response to mother's repeated and unequivocal requests for her counsel to file an appeal, we agree with mother that evidence submitted in support of her motion for relief from default is sufficient to meet her burden of proving Wilensky was professionally incompetent.

For similar reasons, we find that mother has demonstrated prejudice by establishing a reasonable probability of a more favorable outcome. (*A.R.*, *supra*, 11 Cal.5th at p. 252.) When the injury caused by an attorney's deficient performance is the loss of an appeal, the parent demonstrates prejudice by showing she would have taken a timely appeal; she need not "shoulder the further burden of demonstrating the appeal was likely to be

29

successful." (*Id.* at p. 253.) Here, the declarations show that mother would have timely appealed if not for Wilensky's resistance.

Finally, the claimant's promptness and diligence in pursuing an appeal is a "crucial" element of "any successful claim for relief based on incompetent representation." (*A.R.*, *supra*, 11 Cal.5th at p. 253.) In *A.R.*, the mother satisfied this requirement because her notice of appeal was only four days late, and she promptly sought relief from default "along with her timely filed brief on the merits, thus minimizing the risks of delay." (*Ibid.*) Here, mother showed promptness and diligence a different way. She requested of her appointed counsel twice before the filing deadline that counsel file a notice of appeal on her behalf. And she sought aid from the department, among others, in undertaking to get her own notice of appeal timely filed. The superior court rejected this original filing not on timeliness grounds, but because it was submitted by the wrong attorney, on the wrong form, with the wrong kind of signature. Then, approximately two weeks after the filing deadline, mother attempted to file an actual notice of appeal, which was this time rejected because it was untimely.

The *A.R.* Court did not set a four-day delay as an outer limit for promptness, but it emphasized that " '[n]owhere is timeliness more important than in a dependency proceeding." (*A.R.*, *supra*, 11 Cal.5th at p. 253.) Here, mother offers no explanation for why it took an additional 13 days after the filing deadline for her to personally attempt filing the notice of appeal. And a substantially larger delay was caused by the fact that FDAP waited two months after the filing deadline to file a motion for relief from default. These circumstances are concerning, as they caused significantly more delay than the *A.R.* Court found acceptable, even without considering that there was significant additional delay before the parties filed their appellate briefs on

30

the merits. But the delays have not impeded permanency planning for Ollie and indeed, mother's appeal from a subsequent review hearing remains pending. Thus, although we consider the issue close, we conclude that mother's efforts to secure a timely appeal before the deadline passed and then to file her own notice of appeal are sufficient to establish promptness and diligence on her part, and mother has satisfied the requirements for obtaining relief from default on her appeal.

## III.  Mother's Claims Lack Merit

Mother disputes the sufficiency of the evidence to support two findings in the September 2024 review order:  that she was afforded reasonable reunification services; and that Ollie could not be safely returned to her custody at that juncture. Both findings are reviewed for substantial evidence. (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 419 [reasonable services finding]; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763 [substantial risk-of-detriment finding].) Under this standard, the appellate court does not reweigh evidence or exercise independent judgment, but reviews the record "in the light most favorable to the court's determinations and draw[s] all reasonable inferences from the evidence to support the findings and orders." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) In undertaking this review, we are mindful that "appellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) Thus, the question before us with regard to the fact-finding of the juvenile court is, " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*In re V.L.* (2020) 54 Cal.App.5th

31

147, 155; *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1239, disapproved on other grounds in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8.)

### A. Reasonable Services Finding

"To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426, italics omitted (*Tracy J.*).)  In this case, the problems that led to the dependency stem from domestic violence, and as to mother specifically these problems include her inability to recognize or acknowledge how her violent relationship with father put Ollie at risk of harm.  The record evidence summarized herein shows the department worked hard to provide mother with services designed to remedy these problems; that it maintained reasonable contact with her; and that it made reasonable efforts to assist her in areas where compliance with the case plan proved difficult.  This evidence amply supports the reasonable services finding.

Mother focuses exclusively on her right to visitation, which is an important component of a reunification plan.  (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 673.)  But her claim that she was denied reasonable visitation is without merit.  At disposition, the court ordered a case plan for mother that provided for weekly supervised visitation for a minimum of three hours per week and granted the social worker discretion to select the time, place and manner of the visitation.  The social worker also had discretion to move to unsupervised visits including up to two overnight

visits per week.  And the case plan expressly stated that the social worker retained discretion to reduce visitation to the minimum even after visitation had been increased.  There is no dispute about the propriety of this visitation plan, which did not delegate authority to the department to decide whether visitation would occur.  (See *In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374: *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)  And pursuant to this plan, mother had worked her way up to supervised visits six days a week, and a supervised overnight visit.  Mother ignores this evidence of the reasonable services she received pursuant to this plan.

Instead, Mother complains narrowly about the brief period after the August 15 hearing.  First, she argues the court's oral ruling at the hearing lacked sufficient guidance or structure to constitute a visitation order.  This argument assumes erroneously that the court set aside mother's existing visitation plan.  The August 15 ruling was intended *only* to implement a settlement regarding the discrete issue of overnight supervised visits.  There is no evidence that the order was intended to supplant the existing visitation plan, with which it was fully compatible for up to two overnight visits per week.  Taking a different tack, mother challenges the court's oral ruling at the August 27 hearing as a severe reduction of her visitation, which she characterizes as unwarranted and unsupported by the evidence.  Mother mischaracterizes the August 27 ruling as a new visitation plan when the record shows that the court only reverted to the status quo pending the contested review hearing that would soon occur.  It is true that immediately before the August 15 hearing, Mother had progressed to much more than minimally required three visits per week, but this more frequent visitation was under the original plan and there is no reason to believe the department would suddenly have refused to allow more than the minimally required

33

number of visits after the juvenile court expressly reinstated the plan at the August 27 hearing. Regardless, the August 27 order is supported by substantial evidence that the parties' agreement to afford overnight visits supervised by grandmother could not be implemented because mother was unable or unwilling to demonstrate that she would comply with a safety plan, and because Mother cancelled visits and declined contact for a period after August 20.

Mother also contends the department denied her reasonable services because it allowed her only one overnight visit with Ollie. According to this argument, the department's decision to stop overnight visits despite the successful visit on August 19 unreasonably foreclosed family reunification because there was no evidence that continuing the overnights would jeopardize Ollie's safety. (Citing *Tracy J*, *supra*, 202 Cal.App.4th at p. 1419.) This case shares nothing in common with *Tracy J.*, where developmentally disabled parents received only limited supervised visitation that deprived them of a reasonable opportunity to show they were able to parent their child. (*Id*. at pp. 1425–1427.) Here, the record contains substantial evidence that the department increased the amount of mother's visitation and reduced its level of supervision during the course of the reunification period. At the end of that period, after mother contested the recommendation to provide an additional period of services, the parties agreed that mother could have overnight visits if a safety plan was in place, and the record contains substantial evidence of the department's efforts to implement that agreement. But mother was unable to commit to a safety plan that would ensure father's absence from her home, and almost immediately after the first overnight visit she called the department to cancel visitation, announcing " 'The deal is off,' " and then avoided various contacts with the

34

department until the September review hearing.  This situation, disappointing to everyone, does not alter the fact that the department provided mother with reasonable services.

## B.  Substantial Risk of Detriment Finding

At the six-month review, the juvenile court must order that a child be returned to parental custody unless it finds that returning the child would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  (§ 366.21, subd. (e)(1).)  Courts reviewing a risk-of-detriment finding look for evidence of a "substantial" risk, such that returning the child to parental custody "represents some danger to [the child's] physical or emotional well-being."  (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 788.)  Pertinent factors include the efforts or progress the parent made toward eliminating the conditions that led to the out-of-home placement.  (§ 366.22, subd. (a); *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.)

The conditions that led to Ollie's out-of-home placement pertain to unaddressed and unacknowledged domestic violence, and mother's mental health issues in the wake of the August 2023 incident.  (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)  The department reports and social worker's testimony constitute substantial evidence that, at the end of the six-month review period, mother was unable or unwilling to address these problems in a way that eliminated the risk of harm to Ollie.  Indeed, mother's inability to grapple with these problems was a defining feature of the status review hearing where: mother's testimony had to be cut short; mother presented no closing argument supportive of her contention that Ollie could be returned

35

with family maintenance; and the court felt compelled to make its rulings outside the presence of the parties.

Mother fails to articulate a reasonable basis for challenging the risk-of-detriment finding on this record. She relies heavily on evidence that she has the skills and know-how to be a parent, which overlooks the fact that unaddressed intimate partner violence is what puts Ollie at risk of harm. Contending that she has adequately addressed that problem, mother attempts to portray herself as a safe parent with a difficult personality, but she repeatedly draws inferences favorable to herself, and ignores most of the evidence contained in the department reports.

## DISPOSITION

The September 2024 status review order is affirmed.

TUCHER, P. J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*In re Ollie M.* (A172177)

36